595 So.2d 938 (1992)
Willie MITCHELL, Jr., Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 76038.
Supreme Court of Florida.
February 6, 1992.
Rehearing Denied April 21, 1992.
*939 Larry Helm Spalding, Capital Collateral Representative, Martin J. McClain, Chief Asst. CCR, and Judith J. Dougherty and Thomas H. Dunn, Assts. CCR, Office of Capital Collateral Representative, Tallahassee, for appellant/cross-appellee.
Robert A. Butterworth, Atty. Gen. and Candance M. Sunderland, Asst. Atty. Gen., Tampa, for appellee/cross-appellant.
PER CURIAM.
This is an appeal and cross-appeal from an order on motion for postconviction relief from a sentence of death. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.
Mitchell was convicted of the first-degree murder of Walter Shonyo. The jury recommended the death penalty, and the trial court imposed a sentence of death. The judgment and sentence were affirmed on appeal. In our opinion, we described the circumstances surrounding the crime as follows:
In the early morning of May 1, 1986, the body of Walter Shonyo was found in a residential parking area in Tampa. He had been stabbed approximately 110 times and had a human bite mark on his left arm. He had no wristwatch or wallet, his pants pockets had been emptied and turned inside out, and his pants were undone and pulled down from his waist. Shonyo's truck was found about 1000-1200 feet from his body. There was blood on the floorboard of the truck, especially on the passenger side. All of the blood in the interior of the truck was consistent with Shonyo's blood, but the police later identified palmprints found inside the truck as belonging to Willie Mitchell.
Witnesses testified that at approximately 1:00-2:00 a.m. on May 1, Willie Mitchell arrived to spend the night at his cousin's house. Further testimony revealed that Mitchell had a small cut on his lip and his shirt was all wet with blood. He brought with him a cardboard box full of miscellaneous tools. The next day, Mitchell tried to sell the tools at a gas station but could not get a satisfactory *940 price for them. Later, the police found Shonyo's leather glove, watch and blue windbreaker at Mitchell's cousin's house. One of the witnesses testified that he had seen a small pocketknife in the house with dried blood on it close to where Mitchell slept that night following the murder. Annie Harden, Mitchell's cousin, testified that the appellant told her he had been in a fight with two men at a bar over a woman. Annie stated that Mitchell looked like he had gotten the worst of it, but Mitchell insisted that he had been the winner and stated "[i]f he [one of the men] ain't dead, he wished he was dead." Neither the knife nor the bloody shirt Mitchell wore on May 1 was ever found.
The defense theory was that Shonyo's death was caused by a homosexual rage killing. Mitchell testified that after he left the bar on the night of the murder he spotted Shonyo's truck and decided to burglarize it. After removing some items from the inside of the truck, Mitchell stepped on something with his foot, which turned out to be Shonyo's watch. He picked up the watch and put it in his pocket.
Mitchell v. State, 527 So.2d 179, 179-80 (Fla.), cert. denied, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988).
While not mentioned in the opinion, Shonyo was a night guard at Fogarty Van Lines near the shipping docks. When the employees arrived for work, they noticed Shonyo's truck was gone and saw blood at the location where he usually parked. The truck and Shonyo's body were later found at a location two and one-half miles away and 300 to 400 feet from Mitchell's cousin's house. An examination of the victim indicated an oral acid phosphatase of 2.8 international units per liter and a rectal acid phosphatase of 17.6 international units per liter. A doctor for the State testified that these figures are "generally indicative of insignificant or no sexual activity." A defense doctor testified that the amount of acid phosphatase in the rectum suggested the possibility of sexual activity. When first asked by the police how he happened to have Shonyo's property, Mitchell said he had stolen it from a warehouse. At the trial, he said he made up this story because he was frightened. A forensic odontologist compared cast impressions of Mitchell's teeth with photographs of the bite marks on Shonyo's arm and testified that the bite mark had been made by Mitchell. A defense forensic dentist testified that the bite mark did not contain enough individual characteristics to permit anyone to make an identification.
The trial court conducted an evidentiary hearing on the motion for postconviction relief. The judge found that Mitchell's counsel was ineffective in both the guilt and penalty phases of the trial. As to guilt, the judge concluded that Mitchell had failed to satisfy the requirements of the second prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in that he had failed to show that there was a reasonable probability that the result of the proceeding would have been different but for the inadequate performance. The judge held that Mitchell had carried his burden of proof on both prongs of the Strickland test as it related to the sentencing proceeding.
With respect to guilt, it is evident from a reading of the transcript that the judge was concerned with counsel's failure to follow up on certain tests which the State was going to perform on hair samples and fingernail scrapings which had been obtained by the police. The state attorney told counsel that he would tell him of the results of the tests. However, when the state attorney inquired of the laboratory, he was advised that the tests had never been made, and there was no further communication between the attorneys on the subject. Mitchell argued that defense counsel was negligent in not having these tests made because they might have exonerated him of the crime. The judge recognized that by seeking to have the tests made there was a risk that more inculpatory evidence would be developed, but he accepted counsel's statement at the postconviction hearing that he had made a calculated decision to obtain the tests but ultimately failed to pursue it. In responding *941 to what the judge viewed as a dereliction on the part of counsel for failing to follow through, the State introduced an expert who testified that in her experience testing for blood in fingernail scrapings almost never produced relevant evidence and that the testing of hair samples was only useful to determine whether it "is consistent with or different from the hair standard." We agree with the trial judge that it is unlikely that the jury's finding of guilt would have been different had test results favorable to Mitchell been obtained and introduced at the trial.
Mitchell also made other claims of ineffectiveness, most of which were directed toward counsel's alleged failure to develop more evidence to prove that the crime was committed by James Bivens, a preoperative transsexual who worked as a prostitute and went by the name of Priscilla. Bivens appeared at the trial wearing women's clothes. He weighed approximately 115 pounds and had only one or two top front teeth. He testified that he found the body and became hysterical and told his godsister, Elizabeth Oates, to call the police. Oates confirmed Bivens' testimony. In an effort to avoid the impact of the State's argument that it was obvious that Bivens could not have committed the crime because his teeth would not fit the bite mark on Shonyo's arm, Mitchell produced a witness at the postconviction hearing who testified that she had seen a person she thought to be Bivens whose top front teeth were "too perfect to be real," thereby implying the wearing of dentures.
Mitchell specifically asserts that counsel should have brought out the fact that there were two Fort Lauderdale match folders found in Shonyo's truck because Bivens had testified that he had recently come from Fort Lauderdale to Tampa before the killing. While this would have been useful cross-examination, we cannot say that the failure to use it was ineffective because Mitchell's counsel was surprised when the State produced Bivens at the trial. Counsel had testified that he had tried very hard to locate Bivens prior to trial but had been unable to do so. In any event, we are convinced that any ineffectiveness as it related to this or other evidence which Mitchell suggests would have tended to incriminate Bivens would not have probably changed the result of the jury's finding of guilt.
Mitchell also argues that counsel should have demonstrated that the small pocket knife seen near Mitchell and said to have dried blood on it was the same knife which was later found not to have blood on it when tested by the State. At the trial it was not clear whether the knife which was tested was the one near Mitchell, but evidence produced at the postconviction hearing indicated that it probably was, particularly because part of its handle was found in Shonyo's truck. However, there is nothing in the record to show that the knife could not have had blood on it at one time and then been cleaned off by Mitchell. In any event, due to its small size, there was always some doubt whether this knife was the murder weapon anyway. We do not believe that the introduction of this additional evidence would have probably caused the jury to find Mitchell innocent.
Finally, we reject Mitchell's argument that counsel should have brought out that the State had found a blue and white shirt in a dumpster near Mitchell's residence and had not tested it for blood. Two witnesses testified at the trial that the shirt Mitchell was wearing which was soaked in blood was black. Two others said it was too dark to tell the color of his shirt. No witness testified at the trial that Mitchell was wearing a blue and white striped shirt the night of the crime.
There is no need to discuss Mitchell's other contentions, including his Brady[*] claim. There is competent and substantial evidence to support the denial of relief from his conviction.
By the same token, we cannot say that the trial judge erred in ordering a new sentencing hearing. Defense counsel presented no evidence at the penalty phase *942 of the trial. He testified that he thought he was going to obtain a not-guilty verdict, so he had not prepared for the penalty phase. He had had Mitchell examined by two mental health experts, but he had not made arrangements for them to testify. Both of these doctors indicated that had they been asked, they could have testified to both statutory and nonstatutory mitigation. At the postconviction hearing, Mitchell also introduced evidence of more recent evaluations by mental health experts which indicated the presence of brain damage, resulting primarily from prolonged use of drugs and alcohol. In addition, numerous family members said that had they been asked to do so they could have testified as to Mitchell's history of child abuse, his compassionate and caring nature, and his history of substance abuse.
We affirm the order entered on the motion for postconviction relief.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[*] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).