838 So.2d 1102 (2002)
STATE of Florida, Appellant/Cross-Appellee,
v.
Lawrence Francis LEWIS, Appellee/Cross-Appellant.
Lawrence Francis Lewis, Petitioner,
v.
Michael Moore, Respondent.
Nos. SC96890, SC02-468.
Supreme Court of Florida.
December 12, 2002.
Rehearing Denied February 14, 2003.
*1106 Richard E. Doran, Attorney General, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellant/Cross-Appellee/Respondent.
Todd G. Scher, Litigation Director, Capital Collateral Regional Counsel, Fort Lauderdale, FL, for Appellee/Cross-Appellant/Petitioner.
PER CURIAM.
The State of Florida appeals an order granting in part Lawrence Lewis's motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, in which the trial judge vacated Lewis's sentence of death and ordered a new sentencing proceeding. Lewis petitions this Court for a writ of habeas corpus and cross-appeals the trial court's order, asserting that the trial judge erroneously denied his motion to vacate his conviction for first-degree murder. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons *1107 expressed below, we affirm the trial court's order and deny the petition.

FACTS
The underlying facts of this case were set forth as follows:
At about 10 p.m. on May 11, 1987, the witness Mayberry was a passenger in a truck being driven by the victim, Gordon, who pulled off the highway because he believed that a tire had been thrown in front of his truck. As Gordon approached a jeep parked beside the highway, a man Mayberry later identified as appellant attacked him with a pipe. Gordon ran toward his truck, chased by appellant. As Gordon climbed into the rear of the truck, appellant got in beside Mayberry, who was now driving, and ordered him to stop or be killed. Mayberry refused, jumped out of the truck, and hid for two or three hours beside the highway, during which time he heard Gordon's truck go by several times. He never saw Gordon alive again.
Appellant appeared briefly at the home of witness Markum at approximately 11 p.m. on May 11, driving a truck she had never seen before, and reported that his jeep was disabled on the road. Markum testified that there was an injured man on the floor of the truck who was asking for water and said he was in pain. Appellant returned to Markum's between midnight and 2 a.m. on May 12. Markum overheard appellant tell her friend Ballard that appellant had left some guy on U.S. 27 and put the truck in a canal. Witness Hedden, after 12:30 a.m. on May 12, saw appellant driving a truck later identified as Gordon's, and saw a man on the floor who had a broken arm. Witness Rivera testified that when she, Ballard, and appellant went to retrieve appellant's jeep in the early morning hours of May 12, appellant told her he had killed someone.
On May 12, Gordon's truck was pulled from a canal on U.S. 27. On May 13, Gordon's body was found in the tall grass in the median of U.S. 27, across the road from where his truck had been found. The medical examiner testified the victim had five lacerations to the head, injuries to his left shoulder, a compound fracture to his left forearm, and various defensive wounds. The examiner opined that Gordon was alive when the wounds were inflicted and he died from blunt head trauma.
Lewis v. State, 572 So.2d 908, 910 (Fla. 1990). Based on these facts, the jury convicted Lewis of first-degree murder. After Lewis waived mitigation evidence, the jury recommended the sentence of death by a vote of ten to two. The trial judge followed the jury's recommendation and imposed the death penalty, finding no mitigation and three aggravators: heinous, atrocious, or cruel ("HAC"); prior violent felony convictions; and the murder was committed during the course of a kidnaping. Lewis appealed, raising eight claims.[1] *1108 Lewis's conviction and sentence were affirmed by this Court.
Lewis sought postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. After a Huff[2] hearing, the trial court granted an evidentiary hearing to determine: (1) whether Lewis had ineffective assistance of counsel during the guilt phase; (2) whether there was a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as it related to the State's witness, James Mayberry; (3) whether there was ineffective assistance of counsel during the penalty phase; and (4) whether the trial court erred by failing to independently weigh aggravating and mitigating circumstances. After the evidentiary hearing, the trial court denied all relief by written order entered on November 5, 1998. Lewis sought a rehearing and, based on his motion, the trial court ordered an additional evidentiary hearing as to Lewis's claim relative to whether Judge Kaplan was biased when he sentenced Lewis to death.[3] Prior to the hearing, however, the trial court reconsidered its initial order and granted the postconviction motion in part, finding that Lewis's counsel was ineffective during the penalty phase. Accordingly, the judge ordered a resentencing and canceled the pending evidentiary hearing.
The State appealed the trial court's order, which grants Lewis a new sentencing proceeding. Lewis cross-appealed, raising five additional issues: (1) whether his counsel was ineffective during the guilt phase of the proceeding; (2) whether Lewis was sentenced to death by a biased judge; (3) whether improper ex parte communications occurred between the trial judge and the prosecutor during the penalty phase; (4) whether additional public records should be disclosed; and (5) whether Lewis is entitled to a resentencing based on erroneous penalty phase jury instructions. For the reasons discussed below, we affirm the trial court's order, which denied the motion to vacate Lewis's conviction but vacated the death sentence and ordered a resentencing.[4] Since the State's appeal addresses the penalty phase, we treat that phase first.

THE STATE'S APPEAL
The State asserts that the trial court erred in granting Lewis a resentencing based on the ineffective assistance of penalty phase counsel because Lewis (as opposed to counsel) was responsible for the failure to present mitigation. Lewis asserts that his waiver of mitigation was invalid since defense counsel failed to conduct an adequate penalty phase investigation and hence could not and did not properly advise him relative to the ramifications of waiving mitigation. The trial court held an evidentiary hearing on this claim at which time numerous witnesses were called. In its final order, the trial judge concluded that defense counsel did not spend sufficient time in preparing for the penalty phase. This finding is supported by competent, substantial evidence.
Lewis's two trial attorneys were the first witnesses to testify at the hearing. Richard Kirsch was lead counsel, and at the time of appointment, he had forty years of experience practicing law and previously *1109 had handled at least one death penalty case. Oliveann Lancy was appointed as co-counsel in the case. Since she had just been admitted to The Florida Bar months prior to the appointment, she relied heavily on Kirsch's direction. Counsel spent a significant amount of time preparing for the guilt phase of the trial. In fact, the billing records indicated that Kirsch and his co-counsel spent over 659 hours on the case, including attending 67 depositions, 13 hearings, and a 20-day trial. In contrast to this vast preparation for the guilt phase, counsel spent very little time readying for the penalty phase proceedings. Kirsch testified that he did not recall spending any time preparing for the penalty phase until after the jury returned its guilty verdict; nor did he direct Lancy or the investigator to do any penalty phase investigation. Importantly, after the guilty verdict was returned, less than 18 hours were spent preparing for the penalty phase.
Counsel was not diligent in discovering mitigation from Lewis's family members and friends. Although Kirsch tried to talk with Lewis's mother (Bonnie Miller), this attempt was hampered because of Kirsch's delay in starting the investigation. At this point, Miller was quite upset that her son was convicted and blamed it on counsel's trial decisions. The only other attempt to interview witnesses that was mentioned during the evidentiary hearing was a brief conversation with Lewis's father, which occurred mere days prior to the penalty phase. Kirsch asked him if he could testify for the defense or be interviewed by Lewis's mental health expert. Lewis's father responded that he did not feel that he had anything that he could offer his son because he was also a convicted felon. When Kirsch was asked whether he talked to the family members and explained to them the information that counsel needed in presenting evidence, he could only recall talking with Miller:
I'm trying to think of what conversations I had with Ms. Miller. It wasn't much and it was, and she just was not going to talk to me. I mean, she had her ideas about what went wrong during the trial with one witness, I think, or one of the witnesses, I don't recall, and I had a reason for not calling. But she was very upset about it. I know she wanted all of the depositions that had been taken and she was just very upset. She didn't care to talk to me.
Counsel never contacted any of Lewis's other family members in an attempt to discover potential mitigation, nor did counsel attempt to obtain mitigating evidence that was contained in Lewis's background records, including Lewis's hospitalization records, school records, and foster care information.
Kirsch focused on mental health evidence in preparing for the penalty phase but waited more than two weeks after the guilty verdict was returned before he requested the trial court to appoint Dr. Joel Klass as the mental health expert. When Dr. Klass first met with Lewis, he described Lewis as being uncooperative, very suspicious, and confused about Dr. Klass's role in the proceedings. Lewis was willing to cooperate during a second interview, however, and provided Dr. Klass with general background information that he had a "rough" childhood, was a loner, abused various drugs and alcohol, had poor grades in school because of his substance abuse problems, and had some form of a psychological evaluation when he was a child. Dr. Klass asserted that he needed documented corroboration before he could render a professional opinion or conclusion. He remembered discussing possible theories with defense counsel and pointing out what information he needed before he could reach a conclusioninformation which he did not receive prior to trial.
*1110 On the day that the penalty phase began, Dr. Klass was the only witness willing and able to testify for the defense. Lewis, however, refused to have Dr. Klass testify. As counsel explained:
[Mr. Kirsch]: Mr. Lewis had his own ideas about what should be presented and specifically said he did not want Doctor Klass to testify.
Q: What were his ideas about what should presented?
A: Mr. Lewis did not want any testimony to be presented that would in any way implicate him in the commission of this crime.
Q: Why is that? Do you know why?
A: I don't know why but he has maintained his innocence. He still did not want anyone to testify that he was in any way implicated in this crime.
Q: What was Doctor Klass prepared to testify to, do you recall?
A: Yes. He was prepared to testify that Mr. Lewis had an allergy to alcohol. It affected him in a strange way and that he would not be able to form the requisite intent to commit first-degree murder and he might act [in] an inappropriate manner, even with [sic] he didn't have to get drunk, a slight amount of alcohol could cause this reaction. Mr. Lewis and Doctor Klass felt that this is what happened on this particular evening.
Q: So that would be, in affect [sic], like a voluntary intoxication. The defendant would have to admit or having been convicted of the crime would show that in mitigation the affect of alcohol on his system?
A: That was going to be Doctor Klass' testimony.
Q: But the defendant refused you to put that on because he still denied his involvement in the crime?
A: That's correct.
Defense counsel represented to the court that Lewis did not want any family members to testify or any other form of mitigation presented.
At the evidentiary hearing, postconviction counsel demonstrated that the following information regarding Lewis was available if a reasonable investigation had been conducted: (1) his mother was an alcoholic and frequently promiscuous; (2) he was exposed to violence and severe neglect; (3) he suffered a skull fracture at the age of two or three which required two weeks of hospitalization, and his mother refused to take him to the hospital so Lewis had to wait until his father returned home from work;[5] (4) he observed his father's violence and domestic abuse on a daily basis, and as a child he declared that he wanted to be blind so he would not have to see what occurred at his home; (5) after Lewis's parents separated, the parents tried to kidnap the children from each other; (6) Lewis was turned over to foster care, but the neglect and abuse he had suffered were so great that the foster care system could not take care of his needs; (7) while he was in foster care, he was frequently shuttled from place to placefrom foster care parents, to a group children's home, to his uncle's house, then back to the children's home, and finally to his father; (8) he had diminished mental capacity and suffered from direct inferential thinking; (9) Lewis had brain damage; (10) he had a recorded history of serious alcohol and drug abuse, including the frequent use of marijuana and LSD; and (11) there was *1111 corroborating evidence that Lewis had consumed a considerable amount of alcohol on the night of the crime. The records also indicated that as far back as 1977, Lewis had undergone neurological testing and an EEG because he was having "temper outbursts," followed by occasional amnesiabehavioral problems which could have been caused by his earlier skull fracture and which indicated that Lewis was suffering from a behavioral lack of control. Dr. Klass reviewed the records that documented the above factors and testified that if he had been provided with this information, he could have rendered a much more complete diagnosis and would have been able to testify to additional mitigators.
Dr. Faye Sultan, a clinical psychologist, reached a similar diagnosis of the defendant. After evaluating Lewis and reviewing his records, she stated that it was clear that Lewis suffers from "multiple psychological and organic disabilities and that he is the product of an environment in which he was severely psychologically and physically damaged." Specifically, she testified:
[I]f you exposed any child to the series of events to which he was exposed, I think the guaranteed outcome would be extraordinary dysfunction. It might look different ways, but this would be a truly damaged individual.... [W]e're talking about a severity of physical and psychological torture that would destroy any child.
Based on the records and her examination, she could have testified to the following mitigating factors: (1) Lewis was the victim of prolonged chronic child abuse; (2) he suffered from physical injuries which had a psychological impact; (3) he was a substance abuser; (4) he suffered from dementia and impulse control problems; (5) he had mild to moderate organic brain damage; (6) Lewis was under the influence of extreme mental or emotional disturbance during the crime; and (7) he was unable to conform his conduct to the requirements of law at that time. In addition to the evidence discussed above, counsel also presented lay witnesses who testified more specifically about the abuse and childhood difficulties which Lewis suffered.
Initially, the postconviction court denied Lewis's claim, finding that pursuant to Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), it did not need to make a specific finding as to whether defense counsel was competent since it was clear that Lewis was not prejudiced by his counsel's actions. Specifically, the postconviction judge was "not persuaded that such mitigating evidence, if developed and presented at the penalty phase, would have affected the jury's recommendation or the sentence imposed by the trial judge." Although noting that Lewis would be entitled to a resentencing under more recent cases, such as Deaton v. Dugger, 635 So.2d 4 (Fla.1993), the court found these cases were not controlling as they were decided after Lewis's trial and sentencing. Lewis moved for a rehearing, asserting that Deaton was applicable. The court subsequently vacated its decision and granted relief relative to Lewis's ineffective assistance of counsel claim:
Upon re-examination of this Court's order, the entire record, and the case law cited by both parties, this Court agrees with the Defendant that the Deaton opinion correctly states the law that applies to the instant case. At the time of trial, the law regarding an attorney's preparation time in penalty phase proceedings was in a state of flux. In light of the Deaton opinion and its progeny, a defendant's penalty phase attorney clearly must have adequate time to prepare for this proceeding to protect the *1112 Defendant's constitutional rights. Equally clear is the fact that a defendant cannot knowingly, intelligently, and voluntarily waive his or her right to present mitigating evidence during the penalty phase when his or her defense counsel does not have adequate time to investigate all mitigating circumstances or witnesses.
During the evidentiary hearings in this case, testimony revealed that Lewis's defense counsel did not have adequate time to fully and properly prepare for Lewis's penalty phase. Therefore, in accordance with Deaton, this Court finds it necessary to vacate the Defendant's death sentence and to grant the Motion for Rehearing based upon the ineffective assistance of counsel.
The standard of review we apply in reviewing the trial court's ruling on this issue is two-pronged: "The appellate court must defer to the trial court's findings on factual issues but must review the court's ultimate conclusions on the deficiency and prejudice prongs de novo." Bruno v. State, 807 So.2d 55, 62 (Fla.2001).
As the trial court properly recognized, Deaton sets forth the appropriate standard that a petitioner must show to prevail on the present claim:
[T]o establish a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that, because of that deficient performance, the defendant was prejudiced. Generally, prejudice is established by a finding that, but for the ineffective assistance of counsel, a reasonable probability exists that the outcome of the proceeding would have been different, or that, as a result of the ineffective assistance the proceeding was rendered fundamentally unfair.

In this case, the trial judge found that Deaton had waived the right to testify and the right to call witnesses to present evidence in mitigation, but concluded that, because his counsel failed to adequately investigate mitigation, Deaton's waiver of those rights was not knowing, voluntary, and intelligent. The rights to testify and to call witnesses are fundamental rights under our state and federal constitutions. Although we have held that a trial court need not necessarily conduct a Faretta type inquiry in determining the validity of any waiver of those rights to present mitigating evidence, clearly, the record must support a finding that such a waiver was knowingly, voluntarily, and intelligently made. See, e.g., Henry v. State, 613 So.2d 429 (Fla.1992).
Deaton, 635 So.2d at 8 (footnotes omitted) (emphasis added). In Deaton, the record revealed that defense counsel did not prepare for the penalty phase until after the guilty verdict was returned and then spent only a minimal amount of time in preparation, informed the defendant only as to a few of the potential mitigating circumstances which could be presented, and did not search for any records to help establish mitigating circumstances. Id. at 8-9. The postconviction court granted a resentencing, finding that by virtue of defense counsel's failure to adequately prepare for the penalty phase, the defendant's waiver of mitigation was not knowing, intelligent, and voluntary. This Court affirmed the trial court's order, holding that in light of the fact that there were a number of mitigating circumstances which existed but were not presented because counsel did not properly prepare for the penalty phase proceeding, counsel's errors were serious enough to have "deprived Deaton of a reliable penalty phase proceeding" and hence counsel's ineffective assistance was prejudicial. *1113 Id. at 9.[6]
In Rose v. State, 675 So.2d 567 (Fla. 1996), the defendant likewise sought relief for ineffective assistance of counsel because his attorney failed to investigate or present substantial mitigation which was available. Specifically, counsel "failed to investigate Rose's background and obtain the school, hospital, prison, and other records and materials that contained the information ... as to Rose's extensive mental problems." Id. at 572. Because counsel was inexperienced in handling a capital case and felt constrained by the amount of time (seventy-nine days) in which he had to prepare, he chose to present a theory suggested by another attorney despite the fact that he thought it was far-fetched. After examining counsel's performance in preparation for and during the penalty phase proceedings, as well as considering the reasons advanced as to why available mitigating evidence was not discovered and presented, we held that counsel was indeed deficient. Id. at 572-73. We further found that Rose established prejudice because evidence of a "severe mental disturbance is a mitigating factor of the most weighty order" and the failure to present the substantial mitigation which was available constituted prejudicial ineffectiveness. Id. at 573.
As the cases above illuminate, the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstatedthis is an integral part of a capital case.[7] Although a defendant may waive mitigation, he cannot do so blindly; counsel must first investigate all avenues and advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision.[8]
In reviewing the current case, we find there is competent, substantial evidence to support the trial court's finding that counsel did not spend sufficient time to prepare for mitigation prior to Lewis's waiver.[9] Kirsch never sought out Lewis's background information and never interviewed other members of Lewis's family; therefore, he was unable to advise Lewis as to potential mitigation which these witnesses *1114 and records could have offered. The only witness who was available and willing to testify in favor of the defendant was a mental health expert who had merely talked with Lewis and had not yet reached a diagnosis because he did not have sufficient information. There is also competent, substantial evidence to support the trial court's finding that Lewis's waiver of the presentation of mitigating evidence was not knowingly, voluntarily, and intelligently made. Based on this lack of a knowing waiver and the substantial mitigating evidence which was available but undiscovered, we hold that Lewis did suffer prejudice.[10] Accordingly, we find that there is competent, substantial evidence to support the trial court's factual determinations and approve the legal conclusion that Lewis established a claim for ineffective assistance of counsel in the penalty phase of the trial.

LEWIS'S CROSS-APPEAL: INEFFECTIVE ASSISTANCE OF COUNSEL
Lewis cross-appeals, asserting that he is entitled to a new trial because of ineffective assistance of counsel during the guilt phase. Specifically, Lewis contends that he is entitled to relief because (1) the State failed to disclose critical impeaching evidence which was never presented to the jury, (2) his counsel did not adequately impeach a key State witness, and (3) his counsel failed to object to highly improper and prejudicial prosecutorial and judicial misconduct. The trial court granted an evidentiary hearing relative to: (1) whether there was a Brady violation pertaining to a witness for the State, James Mayberry; and (2) whether counsel was ineffective in failing to discover important information about Mayberry. All other portions of this claim were denied as either being procedurally barred, insufficiently pled, or refuted by the record. After the evidentiary hearing, the trial court denied this claim altogether. We address each of the above claims separately.

1. The Alleged Brady Violation
Lewis first contends that the State violated the dictates of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it failed to disclose the existence of pending criminal charges of a key State witness (Mayberry), did not disclose that Mayberry received favorable treatment in his criminal cases in exchange for his cooperation in the instant case, and did not disclose that the State helped Mayberry receive medical treatment. The State is obligated to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. To establish such a violation, a defendant must prove three elements:
The evidence at issue must be favorable to the accused, either because it *1115 is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). In reviewing whether prejudice ensued, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at 289-90, 119 S.Ct. 1936.
After an in-depth review, the trial court denied this claim, finding that the evidence adduced at the hearing did not demonstrate that Lewis was entitled to relief on this claim:
Mr. Kirsch was aware that Mr. Mayberry was the State's key witness, as he (Mr. Mayberry) identified the Defendant as the assailant. Mr. Kirsch was aware of Mayberry's criminal records and that he was convicted of numerous crimes. Mr. Kirsch does not recall receiving any of the letters sent by Mr. Ray regarding Mr. Mayberry's pending charges in Broward and Dade County nor did Mr. Kirsch have any idea that Mr. Ray was in contact with anyone in Dade County regarding Mr. Mayberry or his pending charges in Dade County. However, Mr. Kirsch testified that he recalls there were pending charges against Mr. Mayberry, but he does not recall receiving any documents in connection with these pending charges.
. . . .
Ralph Ray testified that he believes criminal histories are Brady material. Mr. Ray further testified that Mr. Kirsch asked for criminal histories and was sent a criminal history on all witnesses. Mr. Ray testified that he did not negotiate a plea with Dade County regarding the pending criminal charges against Mr. Mayberry nor did Mr. Ray ask for any leniency or special treatment for Mr. Mayberry. Mr. Ray further testified that he did not promise or give leniency in the pending Broward cases.
Mr. Ray had no knowledge of paying any hospital bills for Mr. Mayberry, providing treatment or giving any money to seek medical treatment. Mr. Ray did advise Mr. Kirsch, via letter, of the disposition of the Broward and Dade County cases.
Terrell Gardiner is an investigator for the Broward County State Attorney's Office. Mr. Gardiner testified that he called Broward General to inquire as to the hospital's procedure in treating indigents. Mr. Gardiner left a message for Mr. Mayberry at his sister's house advising that prepayment needed for treatment was not required. Mr. Gardiner suggested that Mr. Mayberry should seek treatment for his medical condition (i.e., sores, etc.).
Bill Altfield was an Assistant State Attorney in Dade County and the prosecutor assigned to Mr. Mayberry's pending Dade County case. Mr. Altfield testified that he spoke with Ralph Ray who advised that Johnson (a.k.a.Mayberry) was a key witness, did not need special treatment and to stick to guidelines, which were five (5) to seven (7) years.
James Mayberry received the statutory maximum sentences of five (5) years on both the Broward and Dade cases.
After hearing all of the evidence presented at the hearing, considering argument of counsel, reviewing the legal memoranda and cases provided in support of this claim, this Court finds that there was no Brady violation by the *1116 State and that even if a Brady violation was found to exist, any non-disclosure would be harmless and would not have any affect on the outcome of the trial. Furthermore while it could be said that defense counsel was negligent in not obtaining the necessary documentation pertaining to the pending Dade and Broward cases, the Defendant has failed to show any prejudice flowing from this negligence. As such, the requirements set forth in Strickland, infra, have not been satisfied and the Defendant's claim for relief on this ground is denied.
We agree that the above evidence cannot establish a Brady violation. There was no evidence presented which suggested that Mayberry received any benefit from the State in terms of medical assistance or that he was promised leniency relative to the pending criminal charges in exchange for his cooperation. In fact, all of the witnesses agreed that Ralph Ray, the prosecuting attorney, did not ask for any benefit or breaks for Mayberry.
We further agree with the trial court's conclusion that Lewis cannot demonstrate he suffered any prejudice. Even assuming that the State failed to disclose this information,[11] the impeachment value of this evidence would have been limited. The jury was made aware of the fact that Mayberry was facing criminal charges during the investigation but by the time of Lewis's trial, Mayberry had already been sentenced for his other crimes; hence, any motivation for skewing his testimony in the hopes of favorable treatment would have been diminished. Considering the alleged undisclosed information in the context of the entire record, we find there is no reasonable probability that this evidence could "put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936. See also Way v. State, 760 So.2d 903 (Fla.2000) (affirming denial of postconviction relief where evidence did not put the case in such different light as to undermine confidence in proceeding). Accordingly, we deny this ground.

2. The Strickland Claim
Lewis asserts his trial counsel was ineffective because his counsel (1) failed to effectively impeach Mayberry, (2) failed to call witness David Ballard, (3) failed to object to prejudicial actions by the trial judge, and (4) was rendered ineffective based on actions by the State. In order to establish a claim of ineffective assistance of counsel, Lewis must prove that counsel's performance was deficient and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Valle v. State, 778 So.2d 960, 965 (Fla.2001) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052).
In Lewis's first claim of ineffective assistance of counsel, Lewis contends that counsel was ineffective because he could have employed additional methods to more effectively impeach an important State witness, Mayberry. The trial court denied this claim, finding that Lewis could not demonstrate the prejudice prong. We agree.
Lewis asserts that his counsel could have impeached Mayberry by showing that Mayberry himself was facing pending charges when he identified Lewis as the attacker and so his identification may have been motivated by the hope of favorable treatment in his other pending cases.[12] While counsel might have been *1117 more effective in impeaching Mayberry, counsel's performance was not deficienta standard which this Court has described as making "errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Valle, 778 So.2d at 965. Lewis also claims that his counsel could have been more effective in impeaching Mayberry by informing the jury that Mayberry and Lewis were placed in the same holding cell, possibly tainting Mayberry's identification of Lewis as the assailant. As Lewis recognizes, however, his trial counsel made the strategic decision to not bring this out, asserting that it would draw attention to the fact that Lewis was in jail. Although the wisdom of this decision may be debatable, this does not constitute an error of such magnitude that it falls "measurably outside the range of professionally acceptable performance." Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (holding that counsel's performance is deficient where "the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance"). Lewis finally asserts that his counsel could have impeached Mayberry's credibility by pointing out possible problems that Mayberry had in identifying Lewis as the attacker. The record refutes this claim, however, by demonstrating that counsel elicited an admission from Mayberry that his initial description of the perpetrator was "not very good" and that he could only give a general description.
More importantly, Lewis did not suffer prejudice since there was additional evidence that implicated him as the perpetrator. Not only did Mayberry identify Lewis as the assailant, other witnesses also identified Lewis as possessing the victim's truck on the night of the crime and further testified that Lewis himself admitted he may have killed someone. Finally, when Lewis was informed that he was being arrested for the murder of Michael Gordon, he responded that it "wasn't a murder. That was more like a fight. I was pissed off." As Lewis can show neither deficient performance nor prejudice, we deny relief as to this claim.
In Lewis's second claim of ineffective assistance of counsel, he asserts that counsel was deficient for failing to call David Ballard to testify at trial. This witness initially told police that Lewis had admitted to making a truck stop in the road, killing one of the occupants, throwing him in a ditch, and driving around in the victim's truck. During the grand jury proceeding, however, Ballard stated that Lewis never told him that he hurt anyone, contending that the reason he told police otherwise was because he was drunk and was scared that he could be implicated. Ballard then changed his story again, incriminating Lewis. Defense counsel asserts that the last change in Ballard's testimony was due to the fact that he was facing subsequent, unrelated criminal charges and was hoping for more favorable treatment by implicating Lewis. We deny relief on this ground because no prejudice ensued. Other eyewitnesses testified that Lewis had the victim and his truck and later admitted to possibly killing somebody.
Third, Lewis asserts that his counsel rendered ineffective assistance by not objecting when the trial judge prefaced the jury instructions with the announcement *1118 that the guilt phase portion of Lewis's trial was "not necessarily" very interesting and that jury instructions were usually "pretty boring." The record, however, shows that these comments were made in the context of the judge stressing the importance of the instructions and that the jurors needed to "listen as carefully as possible" to the jury instructions even if they found them lengthy or not as interesting as other portions of the trial. The court's comments did not prejudice the defendant, and hence counsel was not ineffective.
Next, Lewis asserts that his counsel should have objected to the trial court's handling of the jurors' request to hear "testimony or evidence that Larry Lewis was seen in the truck at Holly Lakes Trailer Park including transcripts of testimony from Martin Martin, Stacy Johnson, Chuckie Hedden, Tracy Markum, and ... Mayberry's testimony identifying Lawrence Lewis." The trial judge informed the jury members that they had the right to hear this testimony but that the court reporter would need to read back the entire testimony, so it would take between four and eight hours. The court stressed that the length of time to fulfill the jury's request should not be a factor in its consideration and that the court stood ready to do whatever the jury decided. The jury members discussed this and decided to proceed from their own recollections. Based on these facts, we find that the trial court acted properly in informing the jury as to the procedure of its request; thus, counsel was not deficient for failing to object.
In Lewis's final claim relative to ineffective assistance of counsel, he contends that counsel was rendered ineffective by a Hobson's choice: if he wanted to impeach one of the State's witnesses (Tracy Markum) through prior inconsistent statements, the State would "rehabilitate" her by revealing the fact that Markum had made prior inconsistent statements because the defendant's mother attempted to influence her testimony by bribery.[13] Defense counsel objected to this during the trial, asserting that he had the right to impeach Markum based on prior inconsistent statements and that the State was not permitted to reveal that a third party coerced the testimony unless it could be shown that the defendant was connected to such a plot. The trial court overruled counsel's objection and permitted the State to inquire as to Markum's excuse for her inconsistent statements, but gave curative instructions to the jury that this attempt was not connected to the defendant. Since defense counsel raised this very objection with the trial court, which ruled adversely to him, counsel was not ineffective but acted properly. See, e.g., Swafford v. State, 828 So.2d 966 (Fla.2002) (holding that if counsel raises an issue, the failure to convince the court to rule in an appellant's favor is not ineffective performance). Lewis' claim is without merit.

LEWIS'S REQUEST FOR PUBLIC RECORDS
In Lewis's final claim, he requested certain documents from the Broward County State Attorney's Office, including the prosecutor's notes. The State responded that the prosecutor's notes were either not public records or were exempt and subsequently provided these documents to the trial judge for an in camera inspection. After reviewing this material, *1119 the judge found that certain documents within the notes, such as subpoenas, were subject to disclosure, but that the "requested prosecutor's notes are not public records and are, therefore, not subject to disclosure under Section 119." Lewis challenges this ruling, asserting that if the records contain Brady material, they would be subject to disclosure.
This Court has previously faced a similar Brady issue with regard to a public records request for documents held by the prosecutor:
[T]he State is under a continuing obligation to disclose any exculpatory evidence. Brady, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. In Roberts v. Butterworth, 668 So.2d 580 (Fla.1996), this Court reiterated the standard for when a defendant makes only a general request for exculpatory material under Brady:

Under such circumstances, "it is the State that decides what information must be disclosed" and unless the defense counsel brings to the court's attention that exculpatory evidence was withheld, "the prosecutor's decision on disclosure is final." Pennsylvania v. Ritchie, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987).
668 So.2d at 582. Johnson's request in this case was no more than a general request under Brady. Therefore, we affirm the trial court's dismissal of Johnson's Brady claim.
Johnson v. Butterworth, 713 So.2d 985, 987 (Fla.1998). Likewise, in this case, Lewis does not point to any specific request for exculpatory material under Brady; it is merely a general request. Accordingly, we affirm the circuit court's order denying Lewis's request for disclosure of the prosecutor's notes.

HABEAS CORPUS PETITION
Lewis raises ten claims in his habeas petition. Four of these claims[14] have been rendered moot in light of the fact that Lewis is entitled to a resentencing, and two of his claims[15] have been addressed in the postconviction proceeding and have been found to be without merit.
In his first habeas claim, Lewis contends that appellate counsel was ineffective in failing to argue that the trial court erroneously permitted the admission of testimony that Lewis's mother attempted to bribe a witness. The record reveals that witness Tracy Markum initially made several sworn statements that were favorable to Lewis. Prior to trial, however, she changed her testimony and asserted that she had previously made statements favorable to Lewis because Lewis's mother promised her money and a trip. The State sought to introduce Markum's newly changed testimony and stated that if defense counsel impeached her through the prior inconsistent statements, the State had the right to rehabilitate Markum by eliciting testimony relative to the bribery attempt. Defense counsel contended this *1120 was improper rehabilitation since all parties agreed that there was no proof that Lewis was connected to the improper attempt to influence Markum's testimony. The trial court overruled the objection.
After the State concluded its direct examination of Markum, defense counsel chose to cross-examine Markum relative to her prior inconsistent statements. Markum admitted that she initially lied both to the police and to the grand jury. Before the State attempted to rehabilitate Markum during its redirect, the trial court instructed the jury:
I want to instruct the jury that the jury must not consider the reasons given by this witness for giving inconsistent testimony, under oath, as any proof of guilt of Mr. Lewis since there will be no evidence in any manner that shows that the Defendant had any part in exerting any pressure or any influence, either directly or indirectly, upon this witness or in any way authorized any third party.
That is what is going to come up, any third party to act on his behalf.
Defense counsel objected to the sufficiency of the jury instructions and moved for a mistrial, which was denied. On redirect, the State put on testimony that Lewis's mother had helped Markum with her story and offered her trips and money if she stuck to the story. Lewis contends that appellate counsel was ineffective in failing to raise this preserved, meritorious issue during the direct appeal.[16]
In Jackson v. State, 575 So.2d 181 (Fla. 1991), this Court faced a similar issue where a witness asserted that he had been threatened by members of Jackson's family if he decided to testify. Although there was no evidence that Jackson was responsible for these threats, the trial court permitted the evidence but gave a curative instruction. Upon review, this Court recognized the general rule that a "third person's attempt to influence a witness is inadmissible on the issue of the defendant's guilt unless the defendant has authorized the third party's action." The Court accordingly found that the evidence should have been barred because its probative value was "far outweighed by its prejudicial impact." Id. at 187. However, because the trial court had given a cautionary instruction which helped to minimize the harm of the testimony, this Court held the error to be harmless. Id.
This case is similar to Jackson in that although there was no proof that Lewis was responsible for his mother's attempt to bribe a witness, the prosecutor elicited this testimony to show why Markum's testimony changed. As in Jackson, the trial court erroneously permitted the testimony to be admitted into evidence notwithstanding the fact that the prejudice outweighed its probative value. In light of the trial judge's instructions which explicitly informed the jury that it could not draw from the testimony any inference as to Lewis's guilt, we find this error to be harmless. Hence appellate counsel was not ineffective in failing to raise this claim on appeal. See Downs v. Moore, 801 So.2d 906, 910 (Fla.2001) ("[A]ppellate counsel cannot be deemed ineffective for failing to raise non-meritorious claims on appeal.").
In Lewis's next claim, he contends that appellate counsel was ineffective in failing to argue that the trial court erred in prohibiting counsel from exploring on cross-examination the issue of whether witness Wendy Rivera had ever sought *1121 mental health treatment. Defense counsel explained that when Lewis admitted to Rivera that he had killed a person and that he had a temper, Rivera replied that she could relate to that because she had a temper. During a proffer, Rivera admitted that her mother suggested that she see a therapist and that she had contemplated visiting a psychologist but never did. Defense counsel suggested that this information was relevant to Rivera's credibility, state of mind, and bias, but did not explain how it was relevant to prove these issues. The court found the testimony inadmissible.
Admissibility of evidence is within the sound discretion of the trial court and will not be reversed absent abuse of discretion. See Heath v. State, 648 So.2d 660, 664 (Fla.1994). Pursuant to section 90.608, Florida Statutes (1997), any party may attack the credibility of a witness based on inconsistent prior statements, criminal history, reputation for truthfulness, bias, an inability or lack of opportunity to observe or remember the events, or proof by other witnesses that the witness recalled material facts incorrectly. See § 90.608(1)(a)-(e), Fla. Stat. (1987). In this case, however, the objected-to testimony which defense counsel sought to introduce only marginally furthered any of these methods of impeachment, and its admissibility was within the trial judge's discretion. In conformity with our conclusion that the judge did not abuse his discretion, we deny this claim.
Lewis contends that appellate counsel was ineffective in failing to challenge the trial court's ruling that prohibited the defense from calling Detective Thomas Eastwood to impeach Mayberry's prior testimony. The record reveals that after defense counsel sought to introduce Detective Eastwood's testimony for the purpose of refuting a portion of Mayberry's testimony, the State objected. The defense proffered Eastwood's testimony outside the presence of the jury, and Eastwood testified that when he interviewed Mayberry, Mayberry led him to believe that he was familiar with the area around U.S. 27 and Griffen Road. Further, Mayberry had guessed the missing truck would be found in a canal. Defense counsel contended that this was contrary to Mayberry's testimony that he was not familiar with the area and had not been in the area prior to May 14. The defendant also contended that Mayberry's assertion that he knew the missing truck would be found in a canal was admissible as a statement against interest. The trial judge inquired further from Eastwood, asking him to tell the court specifically what Mayberry had said.
The Court: Tell us again what he told you?
[Eastwood]: During my interview, Your Honor, I asked several questions of Mr. Mayberry.
Did he have any idea where the particular vehicle was found and I said do you know if they found it in a parking lot; if it was burned; if it was recovered in Fort Lauderdale, Miami, or in a canal.
His comment to me: Knowing the area, I was out there. I was walking though it. It may have been in a canal.
. . . .
The Court: He said to you what now? Knowing the area?
The Witness: There was other parts of the interview, Your Honor. [Mayberry] indicated to me that he had walked through the area that evening and during the morning and that he came across canals. He walked along canals and that he even drove Mr. Gordon's vehicle a short way down the road and he remembered seeing the canals and obviously *1122 I brought up some of the possibilities I might be asking him about.
He said if you are going to ask me that question I would think of a canal because there are canals out there. I saw them, but he was referring to that night.
Eastwood did not ask Mayberry whether he had been in the area prior to the night of the crime. The trial court found that these statements did not constitute statements against interest, nor did they constitute impeachment. We agree. Appellate counsel was not ineffective in failing to present this issue on direct appeal, and hence we deny this claim.
In the final claim, Lewis asserts that because the State is seeking the death penalty in this case, aggravating circumstances are essential facts and must be alleged in the indictment. Prior to trial, defense counsel filed a motion to dismiss the indictment and filed a motion requesting a statement of aggravating circumstances, which the State opposed. Both motions were denied, and appellate counsel did not raise these claims on appeal.
This Court has consistently rejected any requirement that capital sentencing requires that aggravating circumstances must be charged in the indictment. See Brown v. Moore, 800 So.2d 223, 225 (Fla. 2001). Although Lewis's counsel now argues that this decision is erroneous in light of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), appellate counsel is not considered ineffective for failing to anticipate a change in law. See Nelms v. State, 596 So.2d 441, 442 (Fla.1992) ("Defense counsel cannot be held ineffective for failing to anticipate the change in the law."). Accordingly, we find this claim is without merit and deny the petition for habeas corpus.

CONCLUSION
For the reasons expressed above, we affirm the order denying relief relative to Lewis's conviction. We also affirm the order vacating the death sentence and remand for a new sentencing proceeding before a jury. Lewis's petition for a writ of habeas corpus is denied.
It is so ordered.
ANSTEAD, C.J., SHAW, WELLS, PARIENTE, LEWIS and QUINCE, JJ., and HARDING, Senior Justice, concur.
NOTES
[1] Lewis contended that the trial court erred in the following ways: (1) denying Lewis's motion to suppress the out-of-court and in-court identification testimony of James Mayberry as it was tainted by unduly suggestive police procedures; (2) excluding the testimony of Lewis's identification expert; (3) admitting irrelevant evidence which bolstered the credibility of the eyewitnesses and prejudiced Lewis in both the guilt and penalty phases; (4) refusing to suppress Lewis's statement made as a result of an illegal arrest; (5) giving erroneous jury instructions regarding excusable homicide; (6) giving erroneous jury instructions defining a reasonable doubt; (7) giving jury instructions which unconstitutionally shifted the burden of proof during the penalty phase; and (8) imposing the death penalty in this case.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] Judge Kaplan had earlier recused himself from the postconviction proceedings.
[4] Since we affirm the trial court's ruling that Lewis is entitled to a resentencing, we deny claims (2), (3), and (5) as moot.
[5] Dr. Klass found this very similar to what happened in the case at hand: the victim was injured and Lewis did not take him to the hospital because that is exactly what happened to him at a young age.
[6] It is significant to note that in Deaton the State raised objections similar to those it is raising now. Specifically, the State challenged the trial court's ruling to grant a resentencing, asserting that (1) Deaton did not suffer prejudice but would have been sentenced to death anyway, and (2) that it was Deaton and his family, rather than the ineffective assistance of counsel, who prevented counsel from presenting mitigating evidence. Id. at 8.
[7] Rose, 675 So.2d at 571 ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. The failure to do so may render counsel's assistance ineffective.") (internal quotation marks and citations omitted).
[8] Koon v. Dugger, 619 So.2d 246, 249 (Fla. 1993) (holding that before counsel may follow a defendant's instruction to waive mitigation, counsel "first must evaluate potential avenues and advise the client of those offering potential merit") (quoting Blanco v. Singletary, 943 F.2d 1477, 1502 (11th Cir.1991)).
[9] In this case, defense counsel had thirty days in which to prepare but spent far less than eighteen hours in preparation. To be clear, the finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case or the number of days which he or she spends preparing for mitigation. Instead, this must be a case-by-case analysis. For example, in Rose, although counsel had seventy-nine days in which to prepare for a resentencing, this was not sufficient time, in part because counsel never had a capital case before. Rose, 675 So.2d at 573.
[10] See, e.g., Mitchell v. State, 595 So.2d 938, 942 (Fla.1992) (finding that counsel was deficient and defendant suffered prejudice when counsel failed to present mitigating evidence that defendant had brain damage, a history of child abuse, and a history of substance abuse); State v. Lara, 581 So.2d 1288, 1289 (Fla.1991) (holding that counsel did not sufficiently prepare for the penalty phase and defendant suffered prejudice because counsel failed to adequately present evidence of child abuse, the defendant's bizarre behavior signaling serious mental disorientation, and prior hospitalization for mental illness); see also Harris v. Dugger, 874 F.2d 756, 763 (11th Cir.1989) (finding that prejudice ensued when counsel failed to properly investigate for the penalty phase and hence did not present witnesses who would have testified merely that the defendant was "a devoted father, husband, and brother," despite the fact that this testimony could have permitted the prosecution to explore the defendant's numerous other felony convictions and that he had been dishonorably discharged from the military).
[11] The suppression need not be willful; a Brady violation can also be established if the State inadvertently suppressed evidence. Way, 760 So.2d at 910.
[12] Lewis also contends that his counsel was ineffective in not discovering that Mayberry received a benefit in exchange for his cooperation in this case. As addressed above, we do not find that Mayberry received such a benefit and thus find that he cannot demonstrate prejudice.
[13] There was no evidence that Lewis knew of his mother's attempt to influence this witness's testimony.
[14] These claims are: (1) appellate counsel was ineffective in failing to challenge the finding of the HAC aggravator; (2) appellate counsel was ineffective in failing to address the "murder in the course of a felony" aggravator as an automatic aggravator; (3) appellate counsel was ineffective in failing to assert that the HAC instruction was unconstitutionally vague; and (4) the Court's prior assessment of Lewis's burden-shifting claim should be revisited in light of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[15] Specifically, Lewis contends that his appellate counsel should have raised as error the manner in which the trial court (1) handled the jurors' request to hear the testimony of certain witnesses and (2) prefaced the jury instructions.
[16] Lewis raised a similar claim in postconviction proceedings. As addressed above, defense counsel objected and properly preserved the trial court's ruling on this issue, and hence, trial counsel was not ineffective.