979 So.2d 195 (2008)
STATE of Florida, Appellant/Cross-appellee,
v.
Virginia LARZELERE, Appellee/Cross-appellant.
Virginia Gail Larzelere, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC05-611, SC06-148.
Supreme Court of Florida.
February 28, 2008.
Rehearing Denied April 3, 2008.
*199 Bill McCollum, Attorney General, Tallahassee, FL, Kenneth S. Nunnelley, Senior Assistant Attorney General, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellant/Cross-Appellee/Respondent.
Bill Jennings, Capital Collateral Regional Counsel, and David Dixon Hendry, Assistant CCRC, Middle Region, Tampa, FL, for Appellee/Cross-Appellant/Petitioner.
PER CURIAM.
The State of Florida appeals an order of the circuit court granting in part Virginia Gail Larzelere's motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, in which the trial judge vacated Larzelere's sentence of death and ordered a new sentencing proceeding. Larzelere cross-appeals the trial court's order, asserting that the trial judge erroneously denied her motion to vacate her conviction for first-degree murder, and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the trial court's order and deny the petition for writ of habeas corpus.

I. FACTS AND PROCEDURAL HISTORY
Larzelere was convicted of first-degree murder on February 24, 1992. This Court set forth the facts of this case on direct appeal as follows:
The appellant was married to Norman Larzelere (the victim), a dentist, and she worked as the office manager for his dentistry practice. On March 8, 1991, at approximately one o'clock in the afternoon, a masked gunman came into the victim's dental office, chased the victim, shot him with a shotgun, and fled. The victim died within a short time after being shot. At the time of the shooting, a dental assistant, a patient, and the appellant were in the office.
The appellant and her adult son, Jason Larzelere, were charged with the victim's murder. The State's theory was that the appellant and Jason conspired to kill the victim to obtain approximately $2 million in life insurance and $1 million in assets. Jason and the appellant were tried separately. The appellant was tried first.
The State presented the following evidence at the appellant's trial. Two men testified that they had affairs with the appellant during her marriage to the victim and that the appellant asked them to help her have her husband killed. Two other witnesses, Kristen Palmieri and Steven Heidle, were given immunity and testified to a number of incriminating actions and statements made by the appellant and Jason regarding the murder. *200 Specifically, their statements reflected that the night before the murder the appellant sent Jason to a storage unit to pick up documents, which included the victim's will and life insurance policies; that the appellant told Jason after the murder, "Don't worry, you'll get your $200,000 for taking care of business"; that the appellant told both witnesses that Jason was the gunman and that he "screwed up . . . he was supposed to be there at 12:30, but he was a half hour late, so [the dental assistant] and a patient were there. That's why I had to fake a robbery."; that the appellant directed the two witnesses to dispose of a shotgun and a .45 handgun by having them encase the guns in concrete and dump them into a creek; and, that, in the days following the murder, Jason and the appellant reenacted the murder, with Jason playing the role of the gunman and the appellant playing the role of the victim. With Heidle's assistance, police recovered the guns from the creek but were unable to conclusively determine whether the shotgun was the murder weapon.
Additional testimony reflected that the appellant gave several conflicting versions of the murder to police, with differing descriptions of the gunman and the vehicle in which he left. The patient who was present at the time of the murder heard the victim call out just after he was shot, "Jason, is that you?"
It was further established that over the six-year period preceding the murder, the appellant obtained seven different life insurance policies on the victim and that within the six months preceding his death, the appellant doubled the total amount payable on his life from over $1 million to over $2 million. Although the victim assisted in obtaining these policies, it was shown that the appellant was the dominant motivator in securing the policies. In addition, evidence was introduced to show that the appellant gave false information and made false statements to obtain the policies (in securing the policies she falsely represented to several insurance agents that pre-existing policies had been cancelled, did not exist, or were being replaced by the new policy). Further, soon after the victim's death, the appellant filed a fraudulent will, which left the victim's entire estate to the appellant. The fraudulent will was prepared on the same date one of the largest insurance policies on the victim's life became effective.
In her defense, the appellant presented evidence in an attempt to show that her inconsistent versions of the murder were due to her state of mind due to the distress of having just lost her husband; that the victim assisted in obtaining all of the insurance policies; that the appellant's lovers did not think she was serious about having her husband killed; that Heidle and Palmieri were not believable and perjured themselves; and that Heidle and Palmieri were unable to obtain incriminating statements from the appellant after they had been requested to do so by police.
Larzelere v. State, 676 So.2d 394, 398-99 (Fla.1996) (footnote omitted). After Larzelere waived the presentation of mitigation evidence, the jury recommended the sentence of death by a seven-to-five vote. The trial judge followed the jury's recommendation and imposed the death penalty, finding two aggravating factors: (1) the capital felony was committed for financial gain; and (2) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial judge found no statutory mitigating factors, but he did find the following nonstatutory *201 mitigating factors: (1) Larzelere had the ability to adjust and conform to imprisonmentassigned marginal weight; and (2) Larzelere was not the shooterassigned insignificant weight due to the judge's finding that Larzelere was the mastermind behind the killing. Larzelere appealed, raising fifteen claims.[1] This Court affirmed Larzelere's conviction and sentence. Id. at 408.
On August 31, 2000, Larzelere filed an amended motion for postconviction relief, raising fourteen claims, many of which contained numerous subparts.[2] Later, Larzelere amended her motion, raising two additional claims.[3] After a Huff[4] hearing, *202 the trial court summarily denied many of Larzelere's claims and scheduled others for an evidentiary hearing. State v. Larzelere, No. 91-2561-CFAES (Fla. 7th Cir. Ct. order filed December 14, 2001) (Postconviction Order I). After the evidentiary hearing, the trial court issued a written order denying Larzelere's motion to vacate her conviction but granting her motion to vacate her sentence because the trial court found that Larzelere's counsel had provided ineffective assistance during the penalty phase. State v. Larzelere, No. 91-2561-CFAES (Fla. 7th Cir. Ct. order filed March 24, 2005) (Postconviction Order II).
The State now appeals the trial court's award of a new penalty phase. Larzelere cross-appeals, raising three claims: (1) the postconviction trial court erred when it denied Larzelere's claim that the trial court's jury instructions constituted a constructive amendment or fatal variance to the indictment; (2) trial counsel was conflicted and ineffective during the guilt phase; and (3) the cumulative effect of procedural and substantive errors deprived Larzelere of a fundamentally fair trial.
Larzelere also filed a petition for a writ of habeas corpus with this Court, raising two claims: (1) she was denied effective assistance of appellate counsel because appellate counsel failed to raise on direct appeal the meritorious issue that the trial court's jury instructions and the State's closing argument constituted a constructive amendment or fatal variance to the indictment; and (2) the cumulative effect of procedural and substantive errors deprived Larzelere of a fundamentally fair trial.
For the reasons discussed below, we affirm the trial court's order denying Larzelere's motion to vacate her conviction but vacating her death sentence and ordering a resentencing, and deny Larzelere's petition for a writ of habeas corpus.

II. THE STATE'S APPEAL
The State asserts that the trial court erred in granting Larzelere a resentencing due to her counsel's ineffectiveness because Larzelere prevented her counsel from investigating potential mitigation evidence. We find no error and affirm the trial court's order.
In her motion for postconviction relief, Larzelere alleged that her penalty-phase counsel was ineffective for failing to conduct a reasonable background investigation and that had counsel investigated, they would have unearthed substantial mitigating evidence which could have been presented to the jury or the trial court. She further alleged that her waiver of mitigation was invalid because defense counsel failed to conduct an adequate penalty-phase investigation and hence could not advise her regarding the ramifications of waiving mitigation.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (reaffirming Strickland two-prong analysis for claims of ineffective *203 assistance of counsel). As to the first prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052; see also Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995). For the second prong, the reviewing court must determine whether there is a reasonable probability that but for the deficiency the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. 2052.
The postconviction trial court received eleven days of testimony. Regarding counsel's alleged ineffectiveness during the penalty phase, Larzelere called her trial attorneys, John Wilkins and John Howes, to testify regarding their representation of Larzelere. She called William Lasley, Jason Larzelere's defense attorney, to compare and contrast his representation of Jason to Wilkin's and Howe's representation of Larzelere, and attorney Donald Robert West, an expert witness regarding ineffective assistance of counsel claims, to further critique her counsel's performance. Larzelere called Gary McDaniel, the investigator originally hired by Wilkins to investigate her case, and Dr. Harry Krop, a psychologist consulted by Wilkins after the jury recommendation, to testify about counsel's preparation of mitigation evidence. Larzelere also called Dr. Bill E. Mosman, an expert psychologist, and numerous family members to testify regarding what mitigation could have been presented had defense counsel investigated thoroughly. The State called Dr. Harry Albert McClaren, an expert forensic psychologist, to rebut Dr. Mosman's testimony.
After considering this evidence, the trial court found that Larzelere's on-the-record waiver of the presentation of mitigation evidence did not preclude consideration of her ineffective assistance of counsel claim. The trial court found that Larzelere's waiver could not have been made knowingly and intelligently because her counsel was unable to adequately advise her regarding potential mitigation. The trial court also found that counsel's performance during the penalty and sentencing phases was deficient because
counsel did not spend sufficient time preparing for the penalty phase, never sought out Defendant's background, never sufficiently followed-up on the investigator's report outlining the abuse and family history, and never interviewed Defendant's family members. Counsel did not obtain informed mental health evaluations of Defendant sufficiently in advance of the penalty phase. Counsel presented no mitigation evidence to the jury, and only the testimony of two jail guards and limited information regarding former spousal abuse to the Court. Due to this lack of investigation, counsel was unable to advise Defendant as to the potential mitigation.
Postconviction Order II at 32-33. Finally, the trial court found that Larzelere satisfied her burden of demonstrating prejudice because, given the seven-to-five death recommendation, the trial court could not find that the evidence of Larzelere's childhood sexual abuse and family history "would not have tilted the balance in favor of a recommendation of life." The trial court further explained that a life recommendation likely *204 would have been followed by the sentencing judge.[5]
Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004). We agree with the trial court's determination in all respects. Competent, substantial evidence supports the trial court's finding that Larzelere's waiver was not made knowingly and intelligently because Wilkins and Howes did not investigate possible mitigation sufficiently before Larzelere waived her right to present penalty-phase evidence. The record also supports the conclusion that their deficient penalty-phase performance prejudiced Larzelere.
This Court has held that a defendant may waive the presentation of mitigation evidence so long as her waiver is knowingly, voluntarily, and intelligently made. Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993) (citing Henry v. State, 613 So.2d 429 (Fla.1992)). In State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002), this Court explained that "[a]lthough a defendant may waive mitigation, he cannot do so blindly; counsel must first investigate all avenues and advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision." In Lewis, this Court found that the defendant's waiver was not knowingly, voluntarily, and intelligently made where his counsel had never sought out Lewis's background information and never interviewed other members of Lewis's family; therefore, he was unable to advise Lewis as to potential mitigation which these witnesses and records could have offered. The only witness who was available and willing to testify in favor of the defendant was a mental health expert who had merely talked with Lewis and had not yet reached a diagnosis because he did not have sufficient information.
Id. at 1113-14. This holding that counsel must investigate mitigation before concurring with a defendant's decision to waive mitigation follows the United State Supreme Court's reasoning in Wiggins v. Smith, 539 U.S. at 522-23, 123 S.Ct. 2527 ("[O]ur principal concern in deciding whether [trial counsel] exercised `reasonable professional judgmen[t],' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable." (citation omitted)).
Like trial counsel in Lewis, Wilkins and Howes did not seek information regarding Larzelere's childhood and background. Wilkins could not remember any specific actions taken to investigate mitigation. He could only remember that he and Howes "were jointly pursuing whatever it was we were pursuing." Each of Larzelere's three sisters testified that Wilkins and Howes did not interview them on the topic of mitigation. Yet, all three of the sisters stated that had they been asked, they would have testified during the penalty phase that Larzelere was sexually abused by her father William "PeeWee" Antley. Jason and Jessica Larzelere, two of Larzelere's children, testified that counsel *205 did not explain the concept of mitigation to them and that they would have testified during the penalty phase about Larzelere being physically abused by a prior husband if asked. Jason testified that he tried to contact Wilkins after learning the role of mitigation in a first-degree murder case from his attorney William Lasley but that Wilkins would not take his call. Not only did Wilkins and Howes not interview family members about Larzelere's background, they discounted the portions of McDaniel's investigative report that documented Larzelere's father's alcoholism, possible child abuse, and possible spousal abuse.[6] Wilkins could not remember if he asked Larzelere about the abuse mentioned in McDaniel's report, and Howes could not remember if he asked Don Carpenter, the investigator who was hired to replace McDaniel, to "reinvestigate" potential mitigation.
Unlike the attorneys in Lewis who consulted a mental health expert before allowing Lewis to waive the presentation of mitigation evidence, Wilkins and Howes did not retain Dr. Krop to examine Larzelere until after the jury recommended death. Dr. Krop testified that he had done over 1500 first-degree murder evaluations in his career and that "this case was the only case that I've ever been involved in when I was asked to get involved after the jury had already come back with its recommendation." Donald West testified that there is "probably no worse timing" than to hire an expert after the jury recommendation because "at that point, all you can do is ask the court to override . . . a jury's recommendation which, by law, the court is required to give great weight." Howes testified that he did not know why Dr. Krop was not retained early in the representation because he did not become Larzelere's counsel of record until around the time jury selection began. Wilkins first could not remember why he did not contact Dr. Krop before the recommendation but later explained that he did not contact Dr. Krop sooner because he did not suspect that Larzelere had been abused, and he did not feel that it was worth looking for the needle in the haystack until after the death recommendation.
Ordinarily, counsel is not considered deficient where counsel has made a strategic decision. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Wiggins, 539 U.S. at 528, 123 S.Ct. *206 2527 (quoting Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052). Counsel would have seen a reason to consult a mental health expert regarding Larzelere had counsel interviewed her family members or otherwise pursued the investigator's report. As Dr. McClaren explained, "When you're talking to [Larzelere], boy she's easy to believe, but when you're out of the situation and start looking at all those other conflicting things . . . there are many inconsistencies." The trial court correctly concluded that counsel was deficient for failing to obtain an informed mental health evaluation of Larzelere in advance of the penalty phase.
The record also supports the trial court's finding that counsel's performance did not improve upon retaining Dr. Krop. Wilkins and Howes failed to provide Dr. Krop with the investigator's report, Claude Murrah's trial testimony, or Harry Mathis's deposition, all of which would have alerted Dr. Krop to the possibility of sexual and physical abuse. According to Dr. Krop, Wilkins told him that no family members were available to assist in his evaluation. In State v. Coney, 845 So.2d 120, 129 (Fla.2003) (quoting trial court's order), this Court held that trial counsel's "hurried preparation" for a mental health evaluation was ineffective assistance of counsel, where defense counsel "furnished little or no background information to the doctors, did not attend the evaluations, and did not believe it was his responsibility to explain to the doctors the meaning of statutory mitigation factors under the law." In the instant case, counsel did not give Dr. Krop the investigator's report, Murrah's testimony, or Mathis's deposition, and neither Wilkins nor Howes attended when Dr. Krop was deposed by the State.[7]
Given this evidence, we find that the trial court did not err in concluding that Larzelere's waiver was not made knowingly and intelligently and that trial counsel was deficient for failing to sufficiently investigate potential mitigation.
Finally, we agree that Larzelere satisfied her burden of demonstrating prejudice. Dr. Mosman, the defense's expert, and Dr. McClaren, the State's expert, evaluated Larzelere for purposes of the postconviction hearing, and both concluded that she was sexually abused as a child by her father and her uncle, that she was physically abused as an adult, and that, while not psychotic, she suffers from personality disorders, including narcissistic and histrionic personality disorders, which help explain her relationship troubles and cunning, manipulative behavior. Dr. Mosman further diagnosed Larzelere as suffering from post-traumatic stress disorder and features of obsessive compulsive disorder. Although Dr. McClaren disagreed, Dr. Mosman opined that the statutory mitigating factors of extreme emotional disturbance and substantially impaired capacity to conform conduct were applicable to Larzelere's crime. Dr. Mosman also suggested numerous nonstatutory mitigating factors were applicable, but again Dr. McClaren disputed some of these.[8]
*207 Larzelere's three sisters testified at the evidentiary hearing and confirmed that Larzelere had been sexually abused by their father from around age five until around age thirteen. The sisters stated that they did not realize that testimony regarding their common childhood could have helped Larzelere's defense and that they would have testified about the sexual abuse during the penalty phase had they been asked to do so by defense counsel. Larzelere's older two children, Jason and Jessica Larzelere, testified at the evidentiary hearing that Larzelere's first husband, Harry Mathis, physically abused Larzelere and Jason and that as children they were sexually abused by their grandfather. Jessica explained that she would have testified on her mother's behalf and begged the judge and jury to spare her mother's life if given the opportunity. Likewise, Jason stated that he would have been willing to testify on his mother's behalf after his acquittal on September 22, 1992, and would have begged the judge and jury to spare his mother.
The State argues that we should not find that Larzelere was prejudiced because this "mitigation" evidence would have been more harmful than helpful to her case. The State explains that if the defense had presented a mitigation case, the State would have called Harry Mathis to testify that Larzelere attempted to murder him and would have presented evidence that Larzelere allowed her children to be sexually abused by their grandfather and involved Jason in cocaine trafficking. While we agree that the State could have presented rebuttal evidence during the penalty phase, this does not change our conclusion that Larzelere was prejudiced by her counsel's penalty-phase performance.
Based on the foregoing, we affirm the trial court's holding that Larzelere is entitled to a new sentencing proceeding because her trial counsel was ineffective for failing to investigate and prepare for the penalty phase.

III. LARZELERE'S CROSS-APPEAL
Larzelere cross-appeals, asserting that she is entitled a new guilt-phase trial because: (1) the postconviction trial court erred when it denied Larzelere's claim that the trial court's jury instructions constituted a constructive amendment or fatal variance to the indictment; (2) trial counsel was conflicted and ineffective during the guilt phase; and (3) the cumulative effect of procedural and substantive errors deprived Larzelere of a fundamentally fair trial.

A. Constructive Amendment Claim
Larzelere's argument that she is entitled to a new trial because the trial court's jury instructions and the State's closing arguments constituted a constructive amendment or a fatal variance to the indictment is procedurally barred because it could have been raised on direct appeal. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995) ("[I]ssues that could have been, but were not, raised on direct appeal *208 are not cognizable through collateral attack."). In her petition for a writ of habeas corpus, Larzelere properly raises her appellate counsel's failure to raise this preserved issue on direct appeal. We consider the issue in that context.

B. Ineffective Assistance of Guilt-Phase Counsel

1. Ineffectiveness Due to Conflict of Interest
Larzelere argues that the trial court erred in denying her claim that Wilkins operated under a conflict of interest and was ineffective because he pursued his own financial and legal interests to the detriment of Larzelere's defense. Larzelere believes that Wilkins was conflicted because he could not have her declared indigent for purposes of costs without drawing attention to his impermissible contingency fee contract and because he did not want his eventual payment to be impacted by a claim by the county against any insurance proceeds collected by Larzelere. Larzelere asserts that Wilkins performed deficiently in that he failed to have her promptly declared indigent for costs, failed to consult and hire needed defense experts, and fired his investigator in an effort to minimize costs.
This Court has explained that Florida follows the legal principles set forth in Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and Strickland, when analyzing an ineffective assistance of counsel claim based on a purported conflict of interest:
[I]n order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." A lawyer suffers from an actual conflict of interest when he or she "actively represents conflicting interests." To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction." "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."
Sliney v. State, 944 So.2d 270, 279 (Fla. 2006) (citations omitted) (quoting Cuyler, 446 U.S. at 350, 100 S.Ct. 1708). Prejudice is presumed where an actual conflict is shown to have adversely affected a client's representation. Cuyler, 446 U.S. at 349-50, 100 S.Ct. 1708. The question of whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. Sliney, 944 So.2d at 279. Accordingly, this Court applies a mixed standard of review, deferring to the lower court's factual findings but reviewing its ultimate legal conclusions de novo. Coney, 845 So.2d at 133.
In considering whether Wilkins operated under an actual conflict as defined by Cuyler, the trial court found that Wilkins' contract and investigator McDaniel's contract were not contingency fee arrangements and that the insurance proceeds would be sufficient to cover fees and costs as outlined in the contracts. Thus, the trial court held that Larzelere "provided nothing but mere speculation" that Wilkins failed to hire experts or seek indigency status because he wanted to maximize the amount of insurance proceeds he would receive. Postconviction Order II at 21. We affirm the trial court's denial of relief on this claim. We agree that Larzelere did not demonstrate that her counsel had *209 an actual conflict of interest because she failed to "identify specific evidence in the record that suggests that . . . her interests were impaired or compromised" for the benefit of her attorney. Herring v. State, 730 So.2d 1264, 1267 (Fla.1998); see also Brown v. State, 894 So.2d 137, 159 (Fla. 2004) (finding defendant failed to prove actual conflict where trial court made factual finding that counsel did not attempt to gain proprietary interest in defendant's life story, recordings, and poetry until after close of representation and defendant "did not identify specific evidence in the record that suggested that his interests were impaired or compromised for the benefit of the lawyer or another party").
Wilkins testified that his contract, which was signed by Larzelere and her sister, Jeanette Atkinson, provided for a $100,000 retainer, $3000 per day while in trial, and costs. Wilkins believed that he would be able to collect his fee and costs against any of Larzelere's and Atkinson's assets, but anticipated that he likely would be paid from the insurance proceeds. Wilkins admitted that there was a risk of nonpayment. However, he consulted trusted civil attorneys regarding Atkinson's likelihood of collecting on the insurance policies, and they informed him that her chances of collecting a "good portion" of the two to three million dollars were "substantial." This appraisal alleviated Wilkins' doubts enough for him to take the case under these terms.[9] Rodney Lilly, one of the consultants, testified at the evidentiary hearing and confirmed that he told Wilkins that the insurance case was "worth pursuing, even on a contingency fee basis" because the insurer would have to prove fraud in the inducement to avoid paying the policies, a difficult claim to prove. Lilly's assessment of the insurance case implies that it would likewise be worth pursuing the criminal case in hopes of being paid from the insurance proceeds. Moreover, Gladys Jackson, Wilkins' office manager and bookkeeper at the time of Larzelere's case, testified that she did not recall ever telling Wilkins that a requested action, such as taking a deposition, could not be done in the Larzelere case due to insufficient funds. Thus, Larzelere did not prove that Wilkins failed to hire experts and have her declared indigent because of a financial conflict resulting from the fee arrangement and Wilkins' personal financial problems. She did not prove that Wilkins had an interest in not hiring experts, other than that which any attorney paid by a client or third party would have, because he believed his costs would be paid.
As for investigator McDaniel's contract, Wilkins testified that he did not ask Volusia County to pay the investigative expenses because McDaniel agreed to be privately retained and paid from the insurance proceeds. McDaniel first testified that he was to be paid from Wilkins' retainer, but he later testified, consistent with Wilkins' testimony, that he was hired directly by Larzelere, Jason, and Atkinson, and was to be paid from the insurance proceeds. McDaniel admitted that he agreed to be paid "as the money came in" from the insurance policies. The record also refutes Larzelere's suggestion that Wilkins fired McDaniel in order to minimize costs. McDaniel testified that Wilkins and Howes would not pay for him to go to California to interview Norman Karn and Ronald Lee Hayden, state witnesses, as he requested to do. However, McDaniel acknowledged that he and his *210 company were terminated for not following Wilkins' and Howes' instructions, rather than due to a dispute over expenses. This evidence supports the trial court's finding that Larzelere failed to prove that McDaniel was fired due to a financial conflict of interest. Further, even if the decision to fire McDaniel was purely financial, Larzelere did not demonstrate that this act was adverse to her representation because the evidence shows that Wilkins and Howes hired another investigator, Don Carpenter, to continue McDaniel's work.
Overall, Larzelere failed to show that any interest her attorney may have had in minimizing costs was an actual, not merely potential, conflict that adversely affected her representation.

2. Non-Conflict of Interest Ineffectiveness
Larzelere also argues that her counsel was simply ineffective. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Both prongs of the Strickland test generally present mixed questions of law and fact, requiring this Court to employ a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor, 883 So.2d at 771-72.
Larzelere presented a great deal of evidence regarding Wilkins' alcohol use. She also presented evidence that he was engaging in tax evasion and money laundering on behalf of other clients while acting as her counsel. She presented evidence that Wilkins may have been having financial difficulties at that time and that he answered a complaint by The Florida Bar just days before giving his closing argument in the guilt phase of her trial. However, to prove that counsel acted deficiently, a defendant "must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Dufour v. State, 905 So.2d 42, 51 (Fla.2005) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986)). The only specific errors alleged are that Wilkins failed to consult or hire certain expert witnesses that might have assisted the defense. Larzelere argues that Wilkins was ineffective because, while intoxicated and distracted by financial and legal problems, he made the following prejudicial errors: (a) he failed to consult a mental health expert regarding both phases of the trial; (b) he failed to consult and call a concrete expert and failed to introduce a report of the Federal Bureau of Investigation regarding the concrete samples; (c) he failed to consult and call an insurance expert to testify that Dr. Larzelere's life insurance coverage was reasonable given the family's circumstances; and (d) he failed to consult and call a handwriting expert to examine Dr. Larzelere's will.
After reviewing the record, we find no error in the trial court's determination that Larzelere failed to demonstrate that Wilkins was ineffective for not calling such expert witnesses. Larzelere did not offer evidence of "what these experts would have opined regarding the facts and circumstances" of her case, and given the overwhelming evidence of Larzelere's guilt, even favorable testimony by these sorts of experts would not have undermined our confidence in the verdict. Postconviction Order II at 21.

a. Guilt-Phase Mental Health Expert
The trial court was correct in finding that Larzelere was not prejudiced by *211 not having the assistance of a psychologist or psychiatrist during the guilt phase of her trial. A mental health practitioner's evaluation of Larzelere's mental state would not have significantly contributed to her defense because there was no reasonable basis for arguing that this crime was a second-degree murder. The State presented evidence that Larzelere planned her husband's murder over a period of time. We agree that there was competent, substantial evidence upon which the trial court could conclude that no reasonable person could have found this to be a spontaneous rather than a premeditated crime. Further, none of the psychological experts called at the evidentiary hearing testified that Larzelere was mentally incompetent.

b. Concrete Expert
The trial court did not err in holding that Larzelere failed to prove that Wilkins was ineffective for not consulting or hiring a concrete expert to testify regarding whether the concrete encasing the alleged murder weapon matched the concrete found in a cooking pot in Larzelere's basement. During the evidentiary hearing, Larzelere called John M. Whelan II, a chemistry graduate student at the University of South Florida, to testify regarding the FBI's report about the concrete samples. The trial court ruled that Whelan was not qualified to give an expert opinion on concrete but allowed Larzelere to proffer Whelan's testimony. Larzelere did not challenge on appeal the trial court's decision to not admit Whelan's testimony, and therefore Whelan's testimony is not before this Court. Larzelere has not shown counsel to be ineffective for not calling a concrete expert because she had not demonstrated what an individual qualified as a concrete expert would have testified to in this case or how such testimony would cast doubt on her guilt.
Larzelere's claim that Wilkins should have called the FBI agent who analyzed the concrete samples and introduced into evidence the FBI's report that found that the samples could not be conclusively matched is more fully developed in the record. While Larzelere did not call the FBI agent, she did introduce the report into evidence. The report summarizes the comparison of sample Q1, which was a sample of the cement found in Larzelere's home, and sample K1, which was a sample of the cement encasing the alleged murder weapon recovered from a creek. The report states:
The Q1 and K1 cements differ in color, and exhibit some difference in particle size distribution and mortar composition. However, the K1 cement was exposed to potentially extreme weathering conditions which can affect the comparative properties of the cement. Although it is unlikely that weathering is responsible for the differences observed between the Q1 and K1 cements in this case, it [cannot] be totally eliminated as a possibility.
Neither party introduced this report into evidence during trial, although during his closing argument, Wilkins argued that the State failed to prove that the cement found in Larzelere's home matched the cement encasing the alleged murder weapon. Larzelere claims that effective counsel would have supported this argument by calling the FBI agent and introducing the report.
Again, we agree that Larzelere has not demonstrated prejudice. As William Lasley explained, evidence separating Larzelere from the alleged murder weapon would have theoretically aided her defense. However, the trial court correctly found that defense counsel's extensive cross-examination of the State's informant witnesses, Heidle and Palmieri, and his *212 closing argument did challenge the State's theory that the guns were encased in concrete and dumped in a creek at Larzelere's direction. Given the totality of the evidence, not introducing the indefinite report does not undermine this Court's confidence in the verdict.

c. Insurance Expert
The trial court summarily denied Larzelere's claim that Wilkins was ineffective for failing to consult and call an insurance expert to testify that the Larzelere family had a reasonable amount of life insurance coverage. The trial court held that such testimony would not likely impact the verdict because the reasonableness of the insurance coverage would not discount the State's theory that Larzelere killed her husband to obtain the insurance proceeds and because the State conceded during closing argument that Dr. Larzelere participated in the acquisition of the insurance policies. We find no reversible error.
During his representation of Larzelere, Wilkins consulted two attorneys, Mr. Gibson and Mr. Lilly, whom he considered to be experts in insurance. Lilly, who represented Larzelere's sister, Jeanette Atkinson, in the insurance litigation, testified that he prepared a chart explaining the relationships between the different insurance policies for Wilkins' use in the criminal case. Wilkins used these charts during his opening argument and asserted during both his opening and closing arguments that the State's motive theory did not make sense. He argued that the insurance policies were reasonable for the family, that Dr. Larzelere made $600,000 a year and let Larzelere buy anything that she wanted, and that Larzelere would have made more money by divorcing Dr. Larzelere than by murdering him. While Wilkins did not call a defense witness regarding the insurance policies, he did cross-examine the insurance agents called by the State. His performance was not unreasonable.
Moreover, the trial court properly denied this claim because Larzelere did not demonstrate that she was prejudiced by any failure to discredit the State's financial motive theory. The State's first three witnesses, Norman Karn, Ronald Lee Hayden, and Philip Langston, all testified that Larzelere approached them about killing her husband. Karn, who dated Larzelere in early 1989, testified that Larzelere "[i]n so many words" told him that she wanted Dr. Larzelere dead. He also testified that Larzelere solicited his friend Hayden to kill Dr. Larzelere. Hayden testified next and confirmed that Larzelere asked him if he knew anyone who would kill her husband because she was unable to divorce Dr. Larzelere and wanted to marry Karn. Next, Langston, who met Larzelere in 1989 or 1990 and became romantically involved with her, testified that on one occasion Larzelere told him that she "had to get rid of Norm." When he said that he was not capable of murder, she asked if he knew anyone who would kill Dr. Larzelere for $50,000.

d. Handwriting Expert
The trial court denied Larzelere's claim that Wilkins was ineffective for failing to consult a handwriting expert to examine Dr. Larzelere's will, which left his estate to Larzelere, because there was no reasonable possibility that such evidence would have changed the outcome of Larzelere's trial. We agree that Larzelere was not prejudiced by her counsel's failure to call a handwriting expert. Larzelere claims that such an expert could have refuted the State's accusation that the will was forged. Yet, the probative issue at trial was whether Dr. Larzelere knew that he was signing a will when he signed the document, not whether he actually signed *213 it.[10] A handwriting expert could not offer an opinion on whether Dr. Larzelere knew that he was signing a will, and defense counsel did call Leroy Mahler, the notary public who claimed to have witnessed Dr. Larzelere's signature. We agree that Wilkins' failure to call a handwriting expert was not prejudicial.

3. Conclusion
The record does not demonstrate any actual conflict, other than the dual representation of Larzelere and Jason, which Larzelere waived and this Court affirmed on direct appeal, or any specific prejudicial deficiencies in counsel's performance. Thus, we affirm the trial court's denial of this claim.

C. Cumulative Error
Larzelere argues that she is entitled to a new trial due to her attorneys' joint representation of Larzelere's codefendant, Wilkins' alcohol and drug abuse, his inexperience in capital cases, his financial misdealings, his contingency fee contract that dissuaded him from approaching the court for costs and expenses, his failure to consult experts prior to trial, the circumstantial nature of the case, and the constructive amendments and fatal variances to the indictment. Larzelere's claim is without merit because each of her arguments is either without merit or procedurally barred. See Melendez v. State, 718 So.2d 746, 749 (Fla.1998) (holding that where claims were either meritless or procedurally barred, there was no cumulative effect to consider). This Court found on direct appeal that the trial judge "met the burden of assuring that appellant's [pretrial] waiver was made voluntarily, knowingly, and intelligently," and that he properly denied Larzelere's post-trial motions to discharge counsel because she failed to show how she would be prejudiced by counsel's continued dual representation of Larzelere and Jason. Larzelere, 676 So.2d at 403. Also on direct appeal, the Court found the evidence sufficient to support Larzelere's conviction. Id. at 406. As for Larzelere's postconviction claims, this Court has affirmed the trial court's holding that Larzelere's claim that Wilkins was actually conflicted or ineffective due to his alcohol and drug abuse, his financial misdealings, his alleged contingency fee contract, and his failure to consult defense experts is without merit and that her constructive amendment claim is procedurally barred. Larzelere is not entitled to relief on the basis of cumulative error.

IV. HABEAS CORPUS PETITION
Larzelere raises two claims in her habeas petition. She argues that: (1) she was denied effective assistance of appellate counsel because counsel failed to raise on direct appeal the meritorious issue that the trial court's jury instructions and the State's closing argument constituted a constructive amendment or fatal variance to the indictment; and (2) the cumulative effect of procedural and substantive errors deprived Larzelere of a fundamentally fair trial.

A. Ineffective Assistance of Appellate Counsel
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief *214 based on ineffectiveness of counsel, this Court must determine,
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla. 1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069. Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
Larzelere argues that her appellate counsel erred in not raising the claim that the trial court's reading of a conspiracy instruction and the State's closing argument referencing that instruction impermissibly expanded the grounds on which she could be convicted from the charges set forth in her indictment. She argues that she was embarrassed in her defense because she prepared to defend against the theory that she hired or otherwise induced Jason to shoot Dr. Larzelere, not that she aided and abetted unknown others in a conspiracy to murder Dr. Larzelere. She further argues that this issue would have been meritorious if raised on direct appeal. Specifically, Larzelere asserts that the underlined instruction defining conspiracy contained in the following excerpt should not have been given:
If the defendant paid or promised to pay another person or persons to commit a crime, the defendant must be treated as if she had done all of the things the person who received or was promised the payment did if, one, the defendant knew what was going to happen, two, she made or promised the payment in exchange for the commission, or promised to . . . commit the crime or to help commit the crime, and three, the crime was committed by a co-conspirator.
To be a principal, the defendant does not have to be present when the crime is committed.
In considering the application of this above described instruction on principals to this case, the elements of the limited definition of criminal conspiracy that you must determine have been proven beyond a reasonable doubt are that, one, the intent of the defendant and of the co-conspirator, was that the offense that was the object of the conspiracy, to wit, first degree murder, would be committed, and two, in order to carry out the intent, the defendant and the co-conspirator agreed, conspired, combined, or confederated to cause said offense to be committed, either by them or one of them, or by some other co-conspirator.
It is not necessary that the agreement, conspiracy, combination, or confederation to commit that offense be expressed in any particular words, nor that words passed between the defendant and co-conspirator.

*215 It is not necessary that the defendant do any act in the furtherance of the offense conspired.
It is a defense to a charge of criminal conspiracy that a defendant, after conspiring with one or more persons to commit the offense that was the object of the alleged conspiracy, persuaded the alleged co-conspirators not to do so, or otherwise prevented commission of the offense that was the object of the conspiracy.
The trial judge gave this disputed conspiracy instruction because the standard principal-by-hire instruction uses the term "co-conspirator." The judge explained that he believed this term should be defined to assist the jury in applying the principal-by-hire instruction to the evidence. The defense objected to the instruction and requested that any ambiguity or vagueness in the principal-by-hire instruction be solved by editing paragraph three of the instruction to read: "The crime was committed by Jason Eric Larzelere." The State objected to this proposal, arguing that it was not required to prove that Jason was the shooter, but instead, the jury could consider "whatever evidence has been presented in the case, and determine whether or not the shooter was a co-conspirator of Virginia Larzelere." Later, the State prosecutor referenced the conspiracy instruction in her closing argument.
We find that appellate counsel was not ineffective for failing to raise this issue on direct appeal because the argument is without merit. Neither the trial court's instructions nor the State's closing argument impermissibly expanded the grounds on which Larzelere could be convicted of first-degree murder.
The trial judge did not abuse his discretion by rejecting the defense's proposed instruction or by instructing the jury on the definition of conspiracy. Both Virginia Larzelere and her son Jason Larzelere were indicted for the murder of Norman Larzelere. The indictment alleged that "Virginia Gail Larzelere and Jason Eric Larzelere did, on the 8th day of March, 1991, in Volusia County, Florida, in violation of Florida Statute 782.04, form a premeditated design to effect the death of NORMAN LARZELERE . . . by shooting him with a firearm." This indictment properly charges Larzelere as a principal to the murder. Under Florida law, a person who is charged in an indictment or information with commission of a crime may be convicted on proof that she aided or abetted in the commission of such crime. State v. Roby, 246 So.2d 566, 571 (Fla.1971) (citing Pope v. State, 84 Fla. 428, 94 So. 865 (1922); Myers v. State, 43 Fla. 500, 31 So. 275 (1901)). To be convicted as a principal for a crime physically committed by another, the defendant must intend that the crime be committed and must do some act to assist the other person in actually committing the crime. Terry v. State, 668 So.2d 954, 964-65 (Fla. 1996) (citing Staten v. State, 519 So.2d 622, 624 (Fla.1988)). The State need not prove each codefendant's guilt in order to convict a codefendant of being a principal to a crime. See Potts v. State, 430 So.2d 900, 902 (Fla.1982) ("In order to convict the aider-abettor it is not necessary to show that the principal perpetrator was convicted of the same crime, nor is it even necessary to show that he was convicted at all.") Thus, the indictment did not limit the State to the theory that Jason shot Dr. Larzelere. Larzelere could be convicted as charged upon the State proving beyond a reasonable doubt that she intended that Dr. Larzelere be murdered and that she did some act to assist the person who actually killed Dr. Larzelere. Accordingly, *216 the trial court's instructions were consistent with the broad scope of the indictment and accurately presented the charges against Larzelere to the jury. The instructions did not permit the jury to convict Larzelere upon finding her guilty of conspiracy but only upon finding her guilty of aiding and abetting murder. The instructions were not a constructive amendment or fatal variance.
The State's closing arguments likewise were not improper. Larzelere argues that the State modified its closing argument to capitalize on the conspiracy instruction being read to the jury. After reviewing the record, it appears that the State may have revised its closing argument in light of the added jury instruction.[11] However, again, the State was not limited by the indictment to arguing that Jason was the shooter.
In conclusion, Larzelere's appellate counsel was not ineffective for failing to raise the constructive amendment/fatal variance claim on direct appeal because the claim is without merit. See Rutherford, 774 So.2d at 643. This Court would not have found any error in the trial court's instructions or the State's closing argument had the claim been raised on appeal. Thus, Larzelere has not shown that she is entitled to a new trial.

B. Cumulative Error
In her second habeas claim, Larzelere argues that when considered cumulatively, the errors revealed in her direct appeal, her postconviction motion, her postconviction appeal, and this petition denied her a fundamentally fair trial. Larzelere's cumulative error claim is without merit because each of her arguments is either without merit or procedurally barred. See Melendez, 718 So.2d at 749. While we did find two errors in Larzelere's trial on direct appeal, both errors were harmless. Larzelere, 676 So.2d at 401-02, 408. In this appeal, we have affirmed the trial court's order granting Larzelere a new penalty phase and have found Larzelere's guilt-phase postconviction claims to be without merit. We have likewise rejected her first alleged basis for a writ of habeas corpus. Thus, there is no harmful guilt-phase error to consider cumulatively. Larzelere is not entitled to a new trial on the issue of her guilt.

V. CONCLUSION
For the reasons expressed above, we affirm the trial court's order denying relief relative to Larzelere's conviction. We also *217 affirm the trial court's order insofar as it vacates her death sentence and remands for a new sentencing proceeding before a jury. Larzelere's petition for a writ of habeas corpus is denied.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Larzelere's guilt-phase claims were: (1) the trial court erroneously excluded two witnesses that Larzelere proffered to impeach Heidle; (2) the trial court erroneously denied Larzelere's motion for a mistrial based on Palmieri's statement that Jason had used cocaine in her presence; (3) the trial court erroneously failed to give the jury a number of special instructions; (4) the trial court erroneously admitted only selected portions of taped statements and refused Larzelere's request to introduce the complete statements; (5) the trial court erroneously denied Larzelere's motion to discharge counsel and various other motions connected to that request; (6) the trial court erroneously denied Larzelere's motion for a new trial based on allegations that the jury had received extrajudicial information; (7) the trial court erroneously denied Larzelere's motion for a new trial based upon juror misconduct; (8) the trial court erroneously admitted bullets that were found at Larzelere's residence; (9) the trial court erroneously denied Larzelere's motion to dismiss the indictment based on her claim that the State illegally intercepted a holding cell conversation between herself and Jason, and that the trial court excluded testimony of an investigator who recorded this "illegal" conversation; (10) the trial court erroneously denied Larzelere's change of venue motion; (11) the trial court erroneously denied Larzelere's motion for acquittal based upon insufficient evidence; and (12) the trial court erroneously admitted Jason's hearsay statements. Larzelere raised three issues regarding the penalty phase: (1) the trial court erroneously found duplicative aggravating factorsthe murder was both CCP and committed for financial gain; (2) Larzelere's death sentence is disproportionate because Jason was acquitted and two other participants in the murder were not prosecuted; and (3) Florida's death penalty scheme is unconstitutional.
[2] These claims included: (1) the State knowingly presented perjured testimony, presented misleading and deceptive jury arguments, intimidated witnesses, and violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) newly discovered evidence established Larzelere's innocence; (3) Larzelere was denied a fair trial because her counsel had numerous conflicts of interest; (4) Larzelere was denied effective assistance of counsel during the guilt phase because trial counsel failed to adequately investigate and prepare the defense case and challenge the State's case; (5) Larzelere was denied her rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), at the guilt and penalty phases because counsel failed to obtain an adequate mental health evaluation; (6) the trial court committed fundamental error by giving an unconstitutionally vague CCP jury instruction; (7) the penalty-phase jury instructions improperly shifted the burden to Larzelere to prove that death was inappropriate, and counsel was ineffective for failing to object to these instructions; (8) the trial court's comments and instructions diluted the jury's sense of responsibility toward sentencing, and counsel was ineffective for failing to object to these comments and instructions; (9) Larzelere was denied the effective assistance of postconviction counsel because her lawyers were prohibited from interviewing jurors to investigate the jury misconduct that occurred during Larzelere's trial; (10) execution by electrocution is cruel or unusual punishment or both; (11) execution by lethal injection is cruel or unusual punishment or both; (12) Larzelere may be incompetent at the time of execution; (13) Florida's capital sentencing statute is unconstitutional on its face and as applied; and (14) the cumulative effect of the procedural and substantive errors in Larzelere's trial have deprived her of a fundamentally fair trial.
[3] The supplemental claims were: (15) Florida's death penalty statute is unconstitutional as applied to Larzelere on the basis of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (16) Larzelere was embarrassed in her defense due to fatal variances and constructive amendments of the indictment at trial.
[4] Huff v. State, 622 So.2d 982 (Fla. 1993).
[5] The postconviction trial judge was the same judge who presided over Larzelere's trial and sentencing.
[6] McDaniel's report, dated June 7, 1991, stated that Larzelere provided him with the following information:

She describes the father as a chronic alcoholic, sitting on the porch, drinking at home daily, with no outside hobby or social interest. She was victimized emotionally and physically, as were the other children. Without hesitation, client states that she cursed him when he died, an obvious emotional response to the victimization as an adolescent.
. . . She stated that JEANETTE [Larzelere's sister] could give investigator an overview of defendant's upbringing, except for the issues related to child abuse, which is unspoken among family members. Client believes that all the children were subjected to same.
. . . .
Client attended and graduated from Lake Wales High School in 1970, leaving home as a teenager to marry state's witness HARRY MATHIS (2/19/70). She divorced MATHIS in the city of Lake Wales in or around 1977 after seven miserable years of marriage, during which she was a victim of frequent assaults inflicted by her husband. . . . A review of the civil records should [indicate] an extensive history of domestic assaults and child abuse involving Jason, who was born in 1972, and Jessica in 1976.
[7] Also notable in Coney is that defense counsel was found "plainly deficient" in part because counsel failed to remedy the shortcomings of his preparation "by seeking additional time and resources from the court in preparation for the penalty phase." 845 So.2d at 131 (quoting trial court's order). Wilkins and Howes not only failed to request additional time to prepare for the penalty phase but, rather, asked the court to hold the penalty phase one week after the jury's verdict.
[8] Dr. Mosman proposed the following nonstatutory mitigating factors that could have been presented to the jury or trial court: (1) Larzelere had the ability to be rehabilitated and function in prison; (2) she had been physically and sexually abused and emotionally neglected; (3) she suffered from an emotional disturbance and impairment; (4) she did not commit a crime spree around the time of the murder; (5) she had a disadvantaged and deprived childhood due to lack of friends and social activities caused by her father's pedophilia; (6) there was a multi-generational history of dysfunction and sexual abuse in her family; (7) Larzelere had a good incarceration record and was a low user of prison resources; (8) community and family support systems had failed her; (9) she had a history of medical problems such as Legionnaire's disease and pulmonary issues; (10) she had a history of humanitarian and charitable contributions; (11) in her childhood, she made efforts to shield her sisters from abuse; (11) she had possible alcohol or drug abuse issues; (12) she had a disabled son; and (13) she lost two children, who were adopted by Dr. Larzelere's parents after the murder.
[9] Wilkins learned during his representation that all of Larzelere's property and assets were "mortgaged to the hilt," but he testified that even with that knowledge, he remained confident that he would collect from the insurance proceeds.
[10] The State called Randall J. Hagge, an expert forensic document examiner, who testified that the signature reading "Norman B. Larzelere" on the alleged will was in the same handwriting as that found on documents known to be signed "Dr. Norman Larzelere" by Dr. Larzelere.
[11] Any change of theory from opening to closing was slight. During her opening statement, the prosecutor argued that Larzelere hired or otherwise procured her son Jason to shoot his adopted father Dr. Larzelere. At no point during the State's case-in-chief did the State suggest that someone other than Jason was the shooter. The State solicited a great deal of testimony from Steven Heidle, a friend of Jason Larzelere, and Kristen Palmieri, an employee of Dr. Larzelere, regarding their involvement in covering up the murder but asked comparatively few questions regarding their activities before the murder. During closing argument, the prosecutor argued that the evidence showed "complicity between Kristen Palmieri, Steven Heidle, Jason, and Virginia through the phone calls." The prosecutor made two explicit references to the trial court's conspiracy instruction. She briefly argued that Palmieri and Heidle "were co-conspirators with Virginia Larzelere" because they knew that the murder was going to happen and that if the jury found Heidle and Palmieri to have been "participating with the knowledge of Virginia and in cahoots with Virginia," then the jury should consider their acts, her acts. Ultimately though, the prosecutor still argued during closing that while Heidle and Palmieri were participants in their own ways, "[t]he evidence shows that Kristen Palmieri, however, was not the shooter. Steven Heidle was not the shooter. That shooter was Jason Larzelere."